**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALLIANTGROUP, L.P. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-0479 |
| | § | |
| JEFFREY FEINGOLD, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Alliantgroup, L.P., a Texas limited partnership, sued its former employee, Jeffrey Feingold, a Massachusetts citizen, in Texas state court. Feingold removed to this court on the basis of diversity jurisdiction. (Docket Entry No. 1). Alliantgroup asserted causes of action for breach of contract, breach of fiduciary duty, conversion, tortious interference, civil conspiracy, misappropriation of trade secrets, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. (Docket Entry No. 46).

Feingold's Employment Contract with Alliantgroup contained noncompetition, nonsolicitation, and nondisclosure provisions. Alliantgroup alleged that Feingold violated these contract provisions when he left Alliantgroup and went to work for a competitor, Kahn, Litwin, Renza & Co. ("KLR"), which is based in Rhode Island. Alliantgroup also alleged that Feingold took customer lists and confidential or proprietary information and disclosed that information to KLR. On May 11, 2009, after a hearing, this court entered a preliminary injunction against Feingold, enjoining him from providing services to or soliciting clients to whom he provided certain services or attempted to provide services while he worked for Alliantgroup. (Docket Entry Nos. 48, 49).

Feingold has moved for summary judgment on Alliantgroup's claims.  (Docket Entry No. 80).  Alliantgroup responded and  requested a continuance to take Feingold's deposition.  (Docket Entry No. 83, 85).  Feingold opposed the request for continuance.  (Docket Entry No. 86).  This court granted the continuance and ordered Feingold to determine whether he had any customer lists from Alliantgroup.  (Docket Entry No. 87).  Feingold responded that he had no customer lists from Alliantgroup.  (Docket Entry No. 88).  Alliantgroup supplemented its response, (Docket Entry No. 89), and Feingold replied, (Docket Entry No. 90).

Based on the record; the motion, the response, the supplemental response, and the reply; and the relevant law, this court grants Feingold's motion for summary judgment in part and denies it in part.  A status conference is set for **April 8, 2011** at 8:15 a.m.  Counsel may participate by telephone.

The reasons for these rulings are explained below.

## I.    Background[1]

Alliantgroup is a national tax consulting firm based in Houston, Texas.  Feingold was

---

[1]    The summary judgment record includes: Feingold's Employment Agreement with Alliantgroup, (Docket Entry No. 81, Ex. A-1; Docket Entry No. 85, Ex. A-8); Feingold's February 3, 2009 e-mail to Robert D'Andrea and Paul Oliveira, (Docket Entry No. 81, Ex. A-2; Docket Entry No. 88, Ex. F); this court's memorandum and opinion reforming Feingold's covenant not to compete, (Docket Entry No. 81, Ex. B); the transcript from the April 28, 2009 temporary injunction hearing before this court, (*id.*, Ex. C; Docket Entry No. 85, Exs. B, F (excerpts); Docket Entry No. 88, Ex. E (excerpts); Docket Entry No. 89, Ex. B (excerpts)); the affidavit of Wes Bangerter, Managing Director of Finance and Administration for Alliantgroup, (Docket Entry No. 85, Ex. A); Feingold's December 9, 2008 e-mail to Dhaval Jadav and Steve Ragow, (*id.*, Ex. A-1); Feingold's December 3, 2008 e-mail to Rachael Boaz, (*id.*, Ex. A-2); Feingold's January 6, 2009 e-mail to Steve Ragow and Joel Schwartz, (*id.*, Ex. A-3); Alliantgroup's proposed agreement with Mini-Circuits, (*id.*, Ex. A-4); Feingold's January 9, 2009 e-mail to Dhaval Jadav and Steve Ragow announcing his resignation, (*id.*, Ex. A-5); Feingold's January 10, 2009 e-mail to Sonny Grover and Dhaval Jadav, (*id.*, Ex. A-6); and e-mail chain ending with Feingold's January 10, 2009 e-mail to Sonny Grover and Dhaval Jadav, (*id.*, Ex. A-6); Feingold's February 3, 2009 e-mail to Robert D'Andrea and Paul Oliveira, (*id.*, Ex. A-7); a second affidavit of Wes Bangerter, (*id.*, Ex. C); Ronald Masiello's January 7, 2010 e-mail to Steffanie Gunn, (*id.*, Att. A-1); Alliantgroup's proposed agreement with Garlock Printing and Converting Corp., (*id.*); Feingold's LinkedIn profile, (*id.*, Ex. D); Feingold's January 11, 2010 e-mail to Laura DePalma, (*id.*, Ex. E); Feingold's affidavit, (Docket Entry No. 88, Ex. A); excerpts from Feingold's deposition, (Docket Entry No. 89, Ex. A).

employed by Alliantgroup as a salesman working primarily in Massachusetts, Rhode Island, and

New York from 2006 to January 2009.  Feingold signed an Employment Agreement containing a

covenant not to compete, a nondisclosure provision, and an agreement to return his $25,000 retention

bonus if he voluntarily resigned from Alliantgroup.  The noncompete provides:

> (a)   **Covenant to Not Solicit**:     During the Employment Term
> and until the date twelve months following the date FEINGOLD
> ceases to be employed by ALLIANTGROUP for any reason (the
> "Restricted Period"), FEINGOLD shall not in Massachusetts,
> whether on FEINGOLD's own behalf or on behalf of or in
> conjunction with any person, firm, partnership, joint venture,
> association, corporation or other business organization, entity or
> enterprise whatsoever ("Person"), directly or indirectly solicit or
> assist in soliciting in competition with ALLIANTGROUP's business
> any service which ALLIANT GROUP provides its actual Clients or
> prospective Clients at the time of termination.

> (b)   **Covenant to Not Compete:**  During the Restricted Period,
> FEINGOLD shall not directly or indirectly:

> (i)     engage in any business that competes with the Business (or
> any businesses that ALLIANTGROUP or its affiliates conduct or
> have taken significant steps toward conducting at the time of
> FEINGOLD's termination of employment) within the State of
> Massachusetts (a "Competitive Business");

> (ii)    enter the employ of, or render any services to, or enter into
> any contractual agreement or relationship with any Person (or any
> division or controlled or controlling affiliate of any Person) that
> engages in a Competitive Business within the State of Massachusetts;

> (iii)   acquire a financial interest in, or otherwise become actively
> involved with, any Competitive Business, directly or indirectly, as an
> individual, partner, shareholder, officer, director, principal, agent,
> trustee or consultant or transfer any business to, or in any other way
> facilitate any other Person's ability to engage in a Competitive
> Business within the State of Massachusetts; or

> (iv)   interfere with, or attempt to interfere with, business
> relationships (whether formed before, on or after the date of this
> Agreement) between ALLIANTGROUP or any of its affiliates and

3

customers, Clients, referring CPAs, suppliers, partners, members, investors, vendors or payors of ALLIANTGROUP. . . .

(e)   **Non-Solicitation of Contractors:**   During the Restricted Period, FEINGOLD will not, directly or indirectly, solicit or encourage any consultant then under contract with ALLIANTGROUP or its affiliates or any referring CPAs to cease working with or referring business to ALLIANTGROUP or its affiliates.

(Docket Entry No. 81, Ex. A-1 at 7–8).

While at Alliantgroup, Feingold marketed Research and Development Tax Credit Studies. Under § 41 of the Internal Revenue Code, taxpayers are entitled to tax credits for expenses related to research and development. 26 U.S.C. § 14; 26 C.F.R. § 1:41-4; *Trinity Indus., Inc. v. United States*, 691 F. Supp.2d 688, 690–91 (N.D. Tex. 2010). The studies identified opportunities to claim the credits. Feingold marketed such studies directly to clients and to CPA firms who could refer clients to Alliantgroup. One of the CPA firms Feingold marketed the services to while with Alliantgroup was Margolin Winer & Evans. Feingold also created a list of Margolin clients for Alliantgroup to solicit business from. One of those clients was Mini-Circuits, located in New York.

On January 6, 2009, Feingold traveled to New York to "pitch" Alliantgroup's R & D Tax Credit services to Mini-Circuits. Feingold reported back to Alliantgroup. "First Margolin Winer client mtg today . . . They will sign [the engagement letter] next couple days (want kickoff call Tuesday) . . . $200K – $700K credit. (Docket Entry No. 85, Ex. A3 (ellipses in original)). The record does not show, however, that this business was certain. "I was a salesman," Feingold testified at the preliminary injunction hearing on April 28, 2009. (Docket Entry No. 56 at 26). "I always thought something was going to close the next day. . . . I met the client once for an hour, there was a potential opportunity there, I got very excited about it. It was — the assessment that it

4

was going to close sooner rather than later or — or definitely going to close versus not close at all was nothing more than that — that salesman's enthusiasm." (*Id.*).

On January 9, 2009, a few days after his meeting with Mini-Circuits, Feingold announced his resignation to Alliantgroup, effective January 16. (Docket Entry No. 85, Ex. A-5). Feingold committed to help in the transition of his work to others at the firm. Feingold wrote:

> I have a number of outstanding proposals, as well as a few upcoming meetings, and I'll be happy to work with you . . . to help transition these. Also, I'll be happy to make some time, if needed, even after my exit date, to help ease the transition. I think we can make this a fairly seamless transition, though, and I'll be happy to help make that work to the best of my ability. I trust that you both know, from our time working together, that you can expect me to manage this change in a friendly and professional way.

(*Id.*).

Feingold accepted a position at KLR, which also did tax consulting work. KLR and Alliantgroup had worked together on providing R & D tax services to clients. Unlike Alliantgroup, KLR did not itself do the tax credit analysis. Instead, KLR identified clients who could benefit from R & D tax credits and referred them to Alliantgroup. If Alliantgroup performed work for the client, it paid KLR a referral fee. (Docket Entry No. 56 at 36). Feingold testified that he believed he would continue to work collaboratively with Alliantgroup while employed at KLR. (*Id.* at 61 ("My assumption . . . was that I'd continue to sell R & D aggressively and, in fact, a lot of that would get flipped to Alliantgroup. We had ongoing projects with Alliantgroup.")).

The next day, Saturday, January 10, Feingold wrote in an e-mail to two other Alliantgroup employees, Sonny Grover and Dhaval Jadav, that he expected the Mini-Circuits deal to "close Monday/Tuesday this week." (Docket Entry No. 85, Ex. A-6). Feingold started working for KLR on January 19. On February 3, Feingold spoke to Terry Strassberg at the Margolin CPA Firm.

Feingold e-mailed Bob D'Andrea and Paul Oliviera, coworkers at KLR, about his conversation:

> I just got a call from Terry Strassberg, a Partner at [Margolin] in NY. I'd done an R&D CPA for Terry's firm recently. I also reviewed tax returns, identified perhaps a half dozen (give or take) R&D credit opportunities, and met with one of them, Mini-Circuits. Probably a big credit. Terry reported that he met with David Mayer, my alliant counterpart in NY, but the firm wasn't impressed. He'd like to consider partnering with KLR for Margolin's R&D work.

> Although my non-compete is specifically for MA, we have to consider any potential risk from 'interference' with alliantgroup relationships in other states. That said, Margolin clearly isn't going to work with Alliant going forward, regardless of potential involvement of KLR or not.

> Terry would like to have a conference call with us ASAP — he's going to make a recommendation to his client, Mini-Circuits asap. . . .

> Please see attached list of clients under consideration for R&D at Margolin — 4 strong candidates, about a half dozen more possible.

(*Id.*, Ex. A-7). The e-mail was produced in this litigation without an attachment. Feingold testified that his references to reviewing tax returns, identifying R & D credit opportunities, and meeting with Mini-Circuits were to activities undertaken while he was an Alliantgroup employee. Feingold testified that he could not recall whether he had created a list of Margolin clients. Had he created such a list, he asserts that it would have been generated from his conversation with his contact at Margolin, after he left Alliantgroup. (Docket Entry No. 56 at 79).

The same day, February 3, 2009, Feingold received an e-mail from Alliantgroup's general counsel stating that Feingold was in breach of his agreement. On February 4, 2009, Alliantgroup sued Feingold in Texas state court, seeking a temporary restraining order and expedited discovery. A hearing was scheduled for February 5, 2009. Shortly before the hearing, Feingold retained a Houston attorney for the limited purpose of representing him at the hearing. Coe appeared at the

hearing on Feingold's behalf and opposed Alliantgroup's requests for a temporary restraining order and expedited discovery. The state court judge denied Alliantgroup's request for a temporary restraining order but granted expedited discovery. The court ordered Feingold to appear in Houston for his deposition on or before February 11, 2009 and scheduled a temporary injunction hearing for February 20, 2009.

On February 6, Alliantgroup noticed Feingold's deposition for February 11 in Houston. His lawyer responded that "due to a number of prior commitments, it will be virtually impossible for me to present Mr. Feingold in Houston by February 11, 2009." (Docket Entry No. 10, Ex. C). She offered to make Feingold available for a deposition on or after February 13, 2009 and asked that the deposition be conducted via teleconference. Alliantgroup did not agree. (*Id.*). On February 10, 2009, Feingold moved for a continuance of the deadlines set by the state court judge. (Docket Entry No. 33, Ex. B).

Feingold then retained a Massachusetts lawyer, Christopher Bell, to represent him in the Texas litigation. On February 10, Bell wrote Alliantgroup and expressed his surprise that it had not agreed to the requested deposition changes "as a matter of professional courtesy." (Docket Entry No. 10, Ex. D). Bell told Alliantgroup that Feingold intended to file a "complaint with the Massachusetts Attorney Generals Office regarding Alliantgroup's violations of Massachusetts law. . . . Alliantgroup could be subject to criminal and civil forfeitures . . . ." (*Id.*). Bell stated that although he could not prevent Feingold from filing this complaint, he believed Feingold "would be willing to delay filing it in an attempt to settle this case amicably" and that "[a]t a minimum, it would behoove all parties to delay the deposition." (*Id.*).

On February 10, 2009, the Houston attorney moved to withdraw as counsel for Feingold.

The state court judge took the motion under advisement.

Feingold did not appear in Houston for his February 11 deposition.  His Houston lawyer informed Alliantgroup that Feingold's position was that he "did not understand that he had to appear in person for his deposition."  (Docket Entry No. 10, Ex. E).  Alliantgroup noticed the deposition again, for February 13.  (Docket Entry No. 33, Ex. C).  On February 12, 2009, Feingold moved to quash because he had "family, medical, and professional obligations that ma[de] it impossible for him to attend his deposition in Houston, Texas."  (*Id.*).  Feingold did not appear for the deposition noticed for February 13 in Houston.  On February 16, 2009, Alliantgroup moved to compel Feingold's deposition and for sanctions, including contempt.  The state court scheduled a show-cause hearing for February 20, 2009.  On February 16, 2009, Feingold moved to continue the February 20, 2009 hearing.  (Docket Entry No. 33, Ex. D).  On February 18, 2009, Feingold removed to federal court.  (Docket Entry No. 1).  Two days later, he filed a motion for extension of time to file an answer because he was retaining new counsel.  (Docket Entry No. 8).  Alliantgroup moved to remand, (Docket Entry No. 10), and Feingold responded,  (Docket Entry No. 15).  At a hearing held on February 27, 2009, this court allowed Bell to substitute in as counsel for Feingold.  (Docket Entry No. 16).  This court granted Feingold's motion for extension of time to answer.

This court denied Alliantgroup's motion to remand.  Alliantgroup moved to expedite discovery.  (Docket Entry No. 20).  Feingold responded, (Docket Entry No. 25), and filed an answer to the complaint and a counterclaim, (Docket Entry No. 27).  On March 23, 2009, this court held a hearing on Alliantgroup's motion to expedite discovery.  (Docket Entry No. 28).  Feingold appeared via telephone and opposed the motion.  (*Id.*).  This court granted Alliantgroup's motion to expedite discovery, ordered Feingold to appear for his deposition in Houston, Texas on April 25 or 26, 2009,

8

and scheduled a temporary injunction hearing for April 28, 2009.  (*Id.*).

On April 28, 2009, at the hearing on Alliantgroup's application for an injunction against Feingold's working for KLR, this court ruled that the covenant not to compete in Feingold's Employment Agreement was overbroad.  (Docket No. 56 at 173–75).  On May 11, this court entered a preliminary injunction against Feingold, reforming the agreement to limit the restraints on client solicitation to those clients to whom Feingold had provided services or specifically solicited to provide services for Alliantgroup.  (Docket Entry No. 48 at 4).  The injunction also limits the scope of the noncompete provision to the territory in which Feingold had worked for Alliantgroup—Massachusetts, Rhode Island, and New York.  (*Id.*).  The preliminary injunction extended until January 13, 2010.  (*Id.*).  Shortly after this injunction was entered, Feingold stopped working for KLR.  (Docket Entry No. 73, Ex. A at 9).  On August 12, 2009, this court dismissed KLR from the suit for lack of personal jurisdiction.  (Docket Entry No. 62).

On January 11, 2010, Alliantgroup moved to have Feingold held in contempt for violating the preliminary injunction.  (Docket Entry No. 70).  Alliantgroup alleged that Feingold violated the injunction by directly soliciting Garlock Printing and Converting Corporation, a company he had solicited R & D Tax Credit business from while at Alliantgroup.  Alliantgroup supplemented its motion for contempt to add an allegation that Feingold had violated the injunction by founding a company to provide R & D Tax Credit studies and by marketing his R & D Tax Credit services to a CPA firm located in Massachusetts.  (Docket Entry No. 71).

Feingold filed an opposition to the motion for contempt, (Docket Entry No. 73).  Feingold denied that he had solicited an Alliantgroup client on January 6.  He admitted that he contacted the Massachusetts CPA firm on January 11, but claimed he mistakenly believed that the injunction on

client solicitation expired on January 11, not January 13, 2010.  This court denied the motion for contempt.  (Docket Entry No. 87).

Feingold then moved for summary judgment on Alliantgroup's claims.  (Docket Entry No. 80).  Alliantgroup responded and  requested a continuance to take Feingold's deposition.  (Docket Entry No. 83, 85).  Feingold opposed the request for continuance.  (Docket Entry No. 86).  This court granted the continuance and ordered Feingold to determine whether he had any customer lists from Alliantgroup.  (Docket Entry No. 87).  Feingold responded that he had no customer lists from Alliantgroup.  (Docket Entry No. 88).  Alliantgroup supplemented its response, (Docket Entry No. 89), and Feingold replied, (Docket Entry No. 90).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State*

*of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

### A.    Breach of Contract

#### 1.    The Enforceability of the Employment Agreement

Feingold first argues that the Employment Agreement he signed at Alliantgroup is unenforceable under the statute of frauds because the parties did not extend it in writing.  Feingold signed the Employment Agreement on September 9, 2007.  The Employment Agreement states:

> The term of this agreement shall be effective from August 6, 2007 to August 6, 2008, unless otherwise terminated in accordance with the terms of this Agreement.  At the end of this term, should the parties mutually consent to continue the employment relationship, then this Agreement (including all terms and conditions found herein) shall continue indefinitely until this Agreement is terminated by one or the parties by providing fourteen (14) days written notice.  Mutual

11

consent of the parties shall be inferred if the employment relationship
continues past August 6, 2008, without either party providing notice
of termination.

(Docket Entry No. 81, Ex. A-1 at 1).

Feingold relies on *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 800 (Tex. App.–
Eastland 2005, no pet.). The employment contract at issue in that case was a two-year agreement.
The court held it could be extended only by written agreement. *Id.* The Agreement at issue in this
case had a one-year term (August 6, 2007 to August 6, 2008). It satisfies the statute of frauds and
may be extended or renewed by the continuation of the employment relationship. Under Texas law,
such a contract is enforceable even if it is not extended in writing. *See, e.g.*, *Fenno v. Jacobe*, 657
S.W.2d 844, 847 (Tex. App.—Houston [1st Dist.] 1993, writ ref'd n.r.e.) (holding that original
agreement with a one-year term was impliedly extended when employee continued to work under
the same circumstances). The Employment Agreement is enforceable.

### 2.     Breach of the Covenant Not to Compete

Feingold contends that Alliantgroup cannot obtain damages for breach of the noncompetition
clause because this court reformed it in entering the injunction. Under Texas law, "the procedures
and remedies in an action to enforce a covenant not to compete provided by Section 15.51 of [the
Texas Business and Commerce Code] are *exclusive* and *preempt* any other criteria for enforceability
of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to
compete under common law or otherwise." TEX. BUS. & COM. CODE § 15.52 (emphasis added).
Under this provision, remedies for breach of a covenant not to compete are limited to the remedies
available under § 15.51(c). *See Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex.
1994) ("Section 15.52 makes clear that the Legislature intended the Covenants Not to Compete Act

12

to largely supplant the Texas common law relating to enforcement of covenants not to compete. Thus, we apply the Covenants Not to Compete Act to the facts of this case, in lieu of 'any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise.'"), *abrogated on other grounds by Sheshunoff Mgmt. Servs, L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006); *Perez v. Tex. Disposal Sys., Inc.*, 103 S.W.3d 591, 593–94 (Tex. App.—San Antonio 2003, pet. denied), *rev'd on other grounds*, 80 S.W.3d 593 (Tex. 2002) ("Just as the Act's criteria for enforcing a covenant not to compete preempt other law, so do the remedies provided under the Act.").

Alliantgroup may seek damages only under section 15.51(c). That section precludes damages for violation of a clause that had to be reformed to be enforceable. This limit applies to damages for breaches that occurred before or after reformation. *See Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 796 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("Applying section 15.51 to this case, once the trial judge reformed the covenant, money damages were precluded. No damages can be awarded for breach prior to the reformation; after reformation, the current injunction was in place preventing ReGlaze from competing with, and thus, harming Arrow."); *see also Safeworks, LLC v. Max Access, Inc.*, No. H-08-2860, 2009 WL 959969, at *5 (S.D. Tex. Apr. 8, 2009) ("If a court reforms a covenant not to compete in order to make it reasonable and enforceable, 'the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be *limited to injunctive relief*.'" (quoting TEX. BUS. & COM. CODE § 15.51(c) (emphasis added))). "If the covenant meets the criteria for enforceability set forth in Section 15.50, a court may award an employer damages, injunctive relief, or both damages and injunctive relief. If the covenant not to compete does not meet the Section 15.50 criteria and

13

the trial court reforms the covenant, a court may award an employer injunctive relief only." *Perez*, 53 S.W.3d at 482.

At the April 28, 2009 temporary injunction hearing, this court ruled that the covenant not to compete was overbroad. (Docket No. 56 at 173–75). The court then reformed the covenant not to compete in accordance with Texas law. Under section 15.51(c), the cases interpreting it, and the evidence in this record, Alliantgroup is not entitled to damages for Feingold's alleged breach of the noncompetition covenants in his Employment Agreement. Feingold's motion for summary judgment on Alliantgroup's claim for damages for breach of contract is granted.[2]

### 3.    Breach of the Nondisclosure Provision

Alliantgroup also claims that Feingold breached the Employment Agreement by disclosing Alliantgroup's confidential information and client data. "[A] non-disclosure agreement may be enforceable even if a covenant not to compete is not." *Tom Jones of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 888 (Tex. App.–Dallas 2003, no pet.); *accord Hi-Line Elec. Co. v. Dowco Elec. Prods.*, 765 F.2d 1359, 1363 n.5 (5th Cir. 1985) (applying Texas law); *see also Guy Carpenter & Co., Inc. v. Provenzales*, 334 F.3d 459, 465 (5th Cir. 2003) (Section 15.50 of the Texas Business and Commerce Code does not "govern or impair the enforceability of nondisclosure covenants."). Under Texas law, nondisclosure provisions are more readily enforced than noncompete clauses "because the non-disclosure provisions are restraints on trade, they do not prevent the employee from making use of the general experience he acquired during employment, and they do not offend public policy." *Olander v. Compass Bank*, 172 F. Supp. 2d 846, 852 (S.D. Tex. 2001) (citing *CRC-Evans Pipeline*

---

[2]    Alliantgroup may, however, seek damages for contempt for violation of the injunction. *See, e.g.*, *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Cookies*, 177 F.3d 380, 383 (5th Cir. 1999). This court denied Alliantgroup's previous motion for contempt. There is no motion for contempt before this court.

*Int'l, Inc. v. Myers*, 926 S.W.2d 259, 265 (Tex. App.–Houston [1st Dist.] 1996, no writ)).

The nondisclosure provision forbids disclosure of :

> any non-public proprietary or confidential information—including without limitation trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals — concerning the past, current or future business, activities and operations of ALLIANTGROUP, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to ALLIANTGROUP on a confidential basis ("Confidential Information") without the prior written authorization of the senior management of ALLIANTGROUP.

(Docket Entry No. 85, Ex. A-8 at 9).  Under the Employment Agreement,

> "Confidential Information" shall not include any information that is (a) generally known to the industry or the public other than as a result of FEINGOLD's breach of this covenant; (b) made legitimately available to FEINGOLD without confidentiality restriction by a third party without breach of any confidentiality obligation of that third party; or (c) required by law to be disclosed; provided that Feingold shall give prompt written notice to ALLIANTGROUP of such requirement, disclose no more information than is so required, and cooperate with any attempts by ALLIANTGROUP to obtain a protective order or similar treatment.

(*Id.*).

Alliantgroup asserts that Feingold has breached his contract by disclosing (1) Alliantgroup's current and prospective client lists and contact information; (2) Alliantgroup's pricing information; (3) contact information for Alliantgroup's current and prospective CPA alliances; (4) information regarding the Mini-Circuits account; (5) information regarding Alliantgroup's current and prospective CPA alliances; (6) information regarding the Mini-Circuits account; (7) information

15

regarding the Seaman Paper Company of Massachusetts, Inc., account; (8) information regarding Alliantgroup's marketing sales and business activities; and (9) information regarding the six to ten clients and/or prospective clients mentioned but not identified by name in an email from Feingold to KLR co-workers.

The essential elements of a breach of contract claim in Texas are:  (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.  *Aguilar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.–Houston 2005, pet. denied).

Alliantgroup's claim must be dismissed because it has not raised a fact issue as to whether any breach of the nondisclosure agreement resulted in damages.  Alliantgroup contends that it sustained damages because Mini-Circuits never signed an agreement with Alliantgroup after Feingold left.  But Alliantgroup has neither identified nor submitted evidence that shows that any breach of the nondisclosure agreement caused Mini-Circuits not to contract with Alliantgroup. Feingold has submitted evidence that Mini-Circuits never became a KLR customer.  His e-mail to his colleagues states that Margolin had already decided not to use Alliantgroup.  Alliantgroup has provided no evidence to the contrary.  Feingold is entitled to summary judgment on Alliantgroup's claim for breach of the nondisclosure provision.

### 4.    The Breach of Retention Bonus Provision

Alliantgroup also claims that Feingold breached the Employment Agreement by failing to repay the $25,000 retention bonus.  Article VIII of his Employment Agreement states:

> A.    **Bonus:** ALLIANTGROUP will pay FEINGOLD the gross amount of [redacted] as a retention bonus within thirty (30) days after the Effective Date.

> B.  **Refund:**  In the event that FEINGOLD voluntarily resigns his employment with ALLIANTGROUP for any reason or is terminated for cause as defined in Article VI of this Agreement, then FEINGOLD must repay ALLIANTGROUP the entire gross amount of the Retention Bonus provided in Article VIII, Paragraph A. FEINGOLD authorizes ALLIANTGROUP to withhold this amount from any monies due FEINGOLD at termination.  Any amount not satisfied by this withholding must be paid by FEINGOLD within thirty (30) days of his termination.

(Docket Entry No. 85, Ex. A-8).  The Employment Agreement required Feingold to forfeit his retention bonus if he "voluntarily resigns . . . or is terminated for cause."

Although Feingold moved for summary judgment on "all [c]ounts," (Docket Entry No. 80 at 1), his motion does not address the retention bonus.  Feingold characterized his departure as a "resignation" in his motion for summary judgment.  (*Id.* at 5 ("Mr. Feingold resigned his position with the Plaintiff on January 13, 2009.")).  Feingold is not entitled to summary judgment on the retention-bonus claim.

### B.  The Trade Secret Misappropriation Claim

Feingold argues that the record does not raise a fact issue as to Alliantgroup's misappropriation claim.  According to Feingold, the names and contact information of Alliantgroup's clients and pricing structure are not confidential, proprietary, or trade secret information because they are readily ascertainable or otherwise unprotected.

Texas law defines a "trade secret" as a "formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it." *Triple Tee Golf, Inc.*, 485 F.3d at 261 (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991)).  To state a claim for trade secret misappropriation under Texas law, a plaintiff must show (1) the existence of a trade

17

secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages. *Moncrief Oil Intern., Inc. v. OAO Gazprom*, — S.W.3d. —, 2010 WL 4813273, at *9 (Tex. App.—Fort Worth 2010, no pet.); *accord Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.—Dallas 2009, pet. denied); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).

To determine whether information is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). All six factors need not be satisfied "because trade secrets do not fit neatly into each factor every time." *Gen. Universal Sys.*, 379 F.3d at 150 (quoting *Bass*, 113 S.W.3d at 740).

Courts in Texas identify trade secrets, proprietary information, and confidential information separately but provide them similar protection if the requirements—including that of secrecy—are met.[3] "Use" of a trade secret refers to "commercial use" and occurs when "a person seeks to profit

---

3   *See, e.g.*, *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 652 (Tex. App.—Houston [1 Dist.] 2009, no pet. hist.) ("Moreover, a covenant not to compete is enforceable not only to protect trade secrets but also to protect proprietary and confidential information."); *Norwood v. Norwood*, No. 2-07-244-

from the use of the secret."[4]

Under Texas law, customer lists may be protected as trade secrets. *See Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 425 & n.14 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (collecting cases). But "[a] customer list of readily ascertainable names and addresses will not be protected as a trade secret." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (citing *Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ)).[5]  Texas courts consider three factors to determine whether a customer list is a trade secret:

---

CV, 2008 WL 4926008, at *8 (Tex. App.—Fort Worth 2008, no pet.) (mem. op.) ("But a former employee may not use confidential or proprietary information or trade secrets the employee learned in the course of employment for the employee's own advantage and to the detriment of the employer."); *Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co.*, No. 14-07-00380-CV, 2008 WL 4527709, at *5 (Tex. App.—Houston [14 Dist.] 2008, pet. denied) (mem. op.) ("The issue, therefore, is whether the mere identity of the potential accounts with which Robinson was working when he left Bluebonnet is a trade secret, or even merely proprietary information accorded similar protection.  To decide whether the information qualifies as a trade secret we must consult the six factors listed above."); *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14-07-00717-CV, 2008 WL 1991747, at *5 n.5 (Tex. App.—Houston  [14 Dist.] 2008, pet. denied) (mem. op.) ("In its brief, Space Place argues the common law tort of misappropriation does not solely depend on the existence of a trade secret.  Essentially, Space Place argues a claim of misappropriation of confidential information can survive even if the information does not constitute a trade secret.  We disagree.  There is no cause of action for misappropriation of confidential information that is not either secret, or at least substantially secret."); *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *7 (Tex. App.—Corpus Christi 2008, no pet.) (mem. op.) ("Examples of such legitimate, protectable interests [in a noncompete covenant] include business goodwill, trade secrets, and other confidential or proprietary information."); TEX. JUR. *Trademark* § 54 ("There is no cause of action for misappropriation of confidential information that is not either secret, or at least substantially secret.").  At least one court collapsed them under the heading "trade secret."  *See Parker Barber & Beauty Supply, Inc. v. The Wella Corp.*, 03-04-00623-CV, 2006 WL 2918571, at *14 n.14 (Tex App.—Austin 2006, no pet.) ("The parties alternatively used each of these terms [trade secret and confidential and proprietary information] at various times.  For ease, we will refer to such information simply as 'trade secrets.'").

[4]   *Gen. Universal Sys., Inc.*, 500 F.3d at 450 (5th Cir. 2007) (quoting *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 464 (Tex. App.—Austin 2004, no pet.)).  "Use" is "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant."  *Id.* at 451 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40).

[5]    *See Adco Indus. v. Metro Label Corp.*, No. 05-99-01128-CV, 2000 WL 1196337, at *4 (Tex. App.—Dallas 2000, no pet.) (not designated for publication) (affirming the trial court's conclusion that customer lists and other information were not trade secrets because the defendant was able to purchase a new customer list and duplicate the process he followed at the plaintiff company to yield information); *Miller*

"(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003).  In considering whether information was readily ascertainable, courts have considered the expense of compiling it.  *See Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983) ("Even if the names and addresses were readily ascertainable through trade journals as the defendants allege, the other information could be compiled only at considerable expense.").[6]  Other Texas courts focus on the method used to acquire the customer information. Even if the information is readily available in the industry, it will be protected if the competitor obtained it working for the former employer.  *See  Brummerhop*, 840 S.W.2d at 633; *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App.—Houston [1st Dist.] 1988, no writ) ("In Texas, courts condemn the employment of improper means to procure trade secrets.

---

*Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ) (affirming a temporary injunction preventing the use of a customer list even though "some information contained [in the list] may have been susceptible to discovery through independent investigation of public material" because "the record [did] not establish that the appellants so gathered it"); *see also Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 129–30 (E.D. N.Y. 1997) (holding that the plaintiff's customer lists were not trade secrets because the customer identity could be easily found through publicly available means, such as the internet, trade shows, trade directories, and telephone books, or were imbedded in the defendant's memory); *Millet v. Loyd Crump*, 96-CA-639, pp. 5–6 (La. App. 5 Cir. 12/30/96); 687 So. 2d 132, 136 (holding that the trial court erred in concluding that customer lists were trade secrets under the Uniform Unfair Trade Secrets Act because the defendant had monthly access to the files to complete an ongoing audit, the defendant could obtain client information when clients contacted her directly, and insurance companies and policy holders also had the information alleged to be confidential).

[6]   *See also Crouch v. Swing Machinery Co.*, 468 S.W.2d 604, 607 (Tex. Civ. App.—San Antonio 1971, no writ) ("[T]here is evidence to the effect that the important information relates not to the identity of particular businesses which might purchase plaintiff's products, but the identity of officers or other employees of such concerns who make the decisions concerning the purchase of such equipment.  There is also evidence which at least tends to show that ascertaining the identity of such key personnel requires the expenditure of considerable time and money.").  Courts have also considered the difficulty of compiling the customer list to determine whether it is confidential.  *See M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

The question is not, 'How could he have secured the knowledge?' but 'How did he?'" (citations and internal quotation marks omitted)), *withdrawn and stayed on other grounds*, 771 S.W.2d 562 (Tex. App.—Houston [1st Dist.] 1989, no writ).[7]

Alliantgroup argues that the list of Margolin clients is a trade secret.  It is disputed whether Feingold had a list of Margolin clients after leaving Alliantgroup and, if he did, whether he created it while he was at Alliantgroup.  In any event, it is undisputed that the Margolin client list was very short, under 15 names, and that the information was limited, and that the names were "readily ascertainable" from Margolin.  The record is insufficient to show that this list is confidential or proprietary.

Alliantgroup has a stronger argument that its pricing information is confidential or proprietary.  But the record shows no basis to infer that Feingold disclosed that information to KLR or that KLR used that information to Alliantgroup's disadvantage.

Alliantgroup has not raised a fact issue that it was damaged by Feingold's disclosure of confidential or proprietary information.  Such a showing is necessary for its misappropriation claim. *Speedemissions, Inc. v. Capital C Enters., Ltd.*, No. 01-07-00400-CV, 2008 WL 4006748, at *3 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *accord Trilogy*, 143 S.W.3d at 463.  Summary judgment is granted as to this claim.

## C.    Conversion

Under Texas law, conversion is the wrongful exercise of dominion and control over

---

[7]    *See also Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 276 (Tex. Civ. App.—Texarkana 1980, writ ref'd n.r.e.) ("The fact that [the information the plaintiff claimed was confidential] might have been available on the open market is not determinative.  The primary issue is whether the [defendants] engaged in a course of conduct to obtain access to confidential business information from the premises of [the plaintiff], without permission in order to facilitate the forming of their new corporation.").

another's property, in a manner that denies or conflicts with the true owner's rights. *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992). While conversion traditionally applies to tangible property interests, courts have relaxed the rule to apply when an underlying intangible right has been merged into a document. *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1569 (S.D. Tex. 1997) (collecting cases); *see Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1983) (allowing claim for conversion of rights conferred by a lease because the rights had been merged into a physical document). Texas courts consider certain customer lists as property subject to conversion and impose liability when a competitor obtained the list while working for a former employer. *Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756, 762 (Tex. App.—Texarkana 1996), *rev'd in part on other grounds*, 939 S.W.2d 146 (Tex. 1997); *see M.N. Dannenbaum, Inc. v. Brummerhip*, 840 S.W.2d 624 (Tex. App.—Houston [14th Dist.] 1992, writ denied**).**

Although Texas courts have recognized claims for conversion "where the underlying intangible right has been merged into a document" such as a customer list, and "there has been conversion of that document," the courts have not extended such a claim to encompass the conversion of intangible information that has not been reduced to writing. *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 981–82 (S.D. Tex. 1997) (quoting *Pebble Beach Co.*, 942 F. Supp. at 1569). Alliantgroup alleges that Feingold converted its client lists. But there is no evidence that Feingold took or used an Alliantgroup customer list when he left to go work for KLR. Feingold's motion for summary judgment on the conversion claim is granted.

### D.    Breach of Fiduciary Duty

Alliantgroup alleges that Feingold breached his fiduciary duty as an employee of Alliantgroup by failing to finalize an agreement with a potential client before he left the firm. Under

Texas law, the elements of a breach of fiduciary duty claim are: (1) the plaintiff and defendant had a fiduciary relationship; (2) the defendant breached its fiduciary duty to the plaintiffs; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Navigant Consulting*, *Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007); *see also Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Whether a fiduciary duty exists is a question of law. *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

An agency relationship such as employer-employee imposes certain fiduciary duties on the parties. *Id*. Courts take all aspects of the relationship into consideration when determining the nature of the fiduciary duties between the parties. *Id*. In *Johnson v. Brewer & Pritchard, P.C.*, the Texas Supreme Court considered whether an associate lawyer at a law firm breached a fiduciary duty to his firm by referring a matter to another firm without obtaining a referral fee for his own employer. 73 S.W.3d 193, 200 (Tex. 2002). The court cited the *Restatement (Second) of Agency* provision on the general duty of an agent: "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Id*. The duties owed by an employee to an employer may be altered by agreement. *Nat'l Plan Adm'rs*, 235 S.W.3d at 700. In determining the scope of an employee's fiduciary duty to his employer, Texas courts consider "not only the nature and purpose of the relationship, but also agreements between the agent and principal." *Id*. In the present case, neither Alliantgroup nor Feingold contends that the Employment Agreement alters the duties between them.

An employee may prepare to go into competition with his employer before resigning without

breaching fiduciary duties owed to that employer.  *Navigant*, 508 F.3d at 284.[8]  "The tension between the obligations of a fiduciary and his rights as a potential competitor reflects two conflicting public policies: one that seeks to protect a business from unfair competition, and the other that favors free competition in the economic sphere.  If the former is carried to its extreme, it deprives a person of the right to earn a living; conversely, the latter right, if unchecked, could make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play. "  *Abetter Trucking Co.*, 113 S.W.3d at 510–11.  But the employee "may not act for his future interest at the expense of his employer . . . by a course of conduct designed to hurt the employer."  *Navigant*, 508 F.3d at 284 (quoting *Johnson*, 113 S.W.3d at 512).

Alliantgroup contends that Feingold breached his fiduciary duty by delaying the Mini-Circuits deal so that he could obtain that business for KLR.  The record demonstrates that Feingold met with Mini-Circuits on January 6, 2008.  He told his colleagues at Alliantgroup about the pending Mini-Circuits deal immediately after his January 6 meeting.  Feingold stated in a January 10 email that he believed the Mini-Circuits deal would close within a few days.  There is no evidence, and Alliantgroup does not contend, that Feingold disparaged the firm to Mini-Circuits or anyone else while he worked for Alliantgroup.  Feingold began working at KLR nine days later, on January 19. There is no evidence that he spoke to anyone at Mini-Circuits or the Margolin CPA firm until

---

[8]   *Ameristar Jet Charter, Inc. v. Cobbs*, 184 S.W.3d 369, 374 (Tex. App.—Dallas 2006, no pet.) (no breach of fiduciary duty when an employee formed a competing business while still employed but did not actually compete with the employer until he resigned); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("An at-will employee may properly plan to compete with his employer, and may take active steps to do so while still employed.  The employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer." (citation omitted)); *see id.* at 511 ("To form his own company, Arizpe had to incorporate or otherwise establish a business entity, obtain permits, and obtain insurance.  These were permissible preparations to compete, not breaches of fiduciary duty.").

February 3.  And there is no evidence that Feingold disparaged Alliantgroup in his conversation with Strassberg, the Margolin partner, in his February 3 conversation.  No evidence supports an inference that Mini-Circuits became a KLR customer or that Alliantgroup pursued the Mini-Circuits business after Feingold left the firm.  Alliantgroup has not presented evidence that its employees attempted to close the Mini-Circuits deal and were rebuffed because of Feingold's alleged delay.  On this record, there is no basis for an inference that Feingold delayed closing a contract between Alliantgroup and Mini-Circuits so that he could obtain the business for KLR.  The record does not present a genuine issue material to determining whether any action by Feingold caused Alliantgroup to lose business from Mini-Circuits or any other entity.

Feingold is entitled to summary judgment on this claim.

### E.    Tortious Interference with Prospective Economic Relations

To establish a claim for tortious interference with prospective business relations, a plaintiff must prove that: (1) there was a reasonable probability that the parties would have entered into a contractual relationship; (2) the defendant committed an "independently tortious or unlawful act" that prevented the relationship from occurring; (3) the defendant committed the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference — that is, that the defendant's actions prevented the relationship from occurring.  *Faucette v. Chantos*, — S.W.3d —, 2010 WL 3703255, *10 (Tex. App.–Houston [14 Dist.] Sept. 23, 2010, no pet. h.); *see also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 563 (S.D. Tex. 1999).  The plaintiff must show that the defendant's conduct was either independently tortious or unlawful, that

is, that the conduct violated some other recognized tort duty. *See Sturges*, 52 S.W.3d at 726; *Astoria Indus. of Iowa*, *Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632 (Tex. App.—Fort Worth 2007, pet. denied). The "prevented the relationship from occurring" element requires "at minimum, that the tortious conduct constitute a cause in fact that prevented the prospective business relationship from coming to fruition in the form of a contractual agreement. The test for cause in fact, or 'but for causation,' is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. filed) (quoting *Doe v. Boys Clubs of Greater Dallas*, *Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

A plaintiff seeking to recover for tortious interference with prospective business relationships must establish proximate causation and damages with evidence rising above mere suspicion or speculation. *See B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 784 (Tex. App.—Corpus Christi 1988, no writ), *superseded by statute on other grounds*.[9]   Absent some evidence raising a fact issue as to whether Feingold's actions prevented Alliantgroup from entering into a business relationship with clients who instead did business with Feingold or KLR, Alliantgroup cannot pursue its claim for tortious interference with prospective business relations. There is no evidence in the summary judgment record that Feingold's use of Alliantgroup's business information, or solicitation of Alliantgroup clients, resulted in that client giving business to Feingold or KLR that it would otherwise have given to Alliantgroup. Summary judgment is granted

---

[9]   *See also Slaughter-Cooper v. Kelsey Seybold Med. Group P.A.*, 379 F.3d 285, 292 (5th Cir. 2004) (doctor who had been terminated from a clinic failed to establish that she suffered actual harm or damage when the tortious interference with prospective business relations claim rested on the speculative contention that her patients would have "sought her out" once she opened her own practice four months later had the clinic not represented to former patients that she had resigned to pursue other professional interests).

dismissing Feingold's claim for tortious interference with prospective business relations.

### F.    Computer Fraud and Abuse Act

Alliantgroup brings a claim under 18 U.S.C. § 1030(g) of the Federal Computer Fraud and Abuse Act.  The CFAA prohibits unauthorized access to a "protected computer" for purposes of obtaining information, causing damage, or perpetrating fraud.  *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 774 (S.D. Tex. 2010) (citing 18 U.S.C. § 1030(a)(2), (a)(4), (a)(5)).  Although the CFAA is a criminal statute, subsection (g) provides a private right of action when one of the five factors in subclauses (I)-(V) is present.  18 U.S.C. § 1030(g); *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156–57 (5th Cir. 2006).  The only factor potentially present in this case is "loss to 1 or more persons during any 1-year period . . . aggregating in at least $5,000 in value."  18 U.S.C. §  1030(c)(4)(A)(1).

Alliantgroup alleges that a violation of the CFAA occurred when Feingold knowingly accessed at least one of Alliantgroup's computers without authorization or exceeded his authorized access to obtain information about current and prospective clients, billing, relationships with CPA firms, or marketing materials.  Alliantgroup cites access to a computer printout of Margolin, Winer & Evans client opportunities.  Feingold moves for summary judgment on the CFAA claim because Alliantgroup has offered no evidence to support its allegations.

To state a civil claim under the CFAA, Alliantgroup must allege "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  *See* 18 U.S.C. § 1030 (c)(4)(A)(1), (g).  The CFAA defines loss as:

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or consequential

damages incurred because of interruption of service.

*Id.* § 1030 (e)(11).  The term "loss" encompasses only two types of harm: costs to investigate and respond to an offense, and costs incurred because of a service interruption.  *Quantlab*, 2010 WL 2593669 at *7; *see also Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 472–78 (S.D. N.Y. 2004), *aff'd* 166 F.App'x 559, 562-63 (2d Cir. 2006).

Alliantgroup does not allege or present evidence of any cognizable losses.  It does not allege an interruption of services as a result of Feingold's actions, or any costs incurred to investigate and respond to an interruptions or any service interruption.  Feingold's motion for summary judgment on Alliantgroup's CFAA claim is granted.

### G.    Civil Conspiracy

The elements of civil conspiracy include (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).  Conspiracy is a derivative tort requiring an unlawful means or purpose.  *Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008); *see also Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (merely proving joint intent to engage in conduct that resulted in injury not sufficient; civil conspiracy required specific intent to agree to accomplish unlawful purpose or to accomplish lawful purpose by unlawful means).

Civil conspiracy is a derivative tort.  *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007).  Because Feingold is entitled to summary judgment on all other tort claims, he is entitled to summary judgment on the civil conspiracy claim.

### IV.    Conclusion

28

Feingold's motion for summary judgment is granted except as to the claim that he failed to return a bonus.  All claims except the breach of contract claim based on Feingold's failure to repay the bonus are dismissed, with prejudice.  A status conference is set for **April 8, 2011**, at 8:15 a.m. to address the only remaining claim.  Counsel may participate by telephone.

SIGNED on March 24, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge